ROBERT WAGGENER - SBN: 118450
LAW OFFICE OF ROBERT WAGGENER
214 Duboce Avenue
San Francisco, California 94103
Phone: (415) 431-4500
Fax: (415) 255-8631
E-Mail: rwlaw@mindspring.com

Attorney for Defendant GALE JOSEPH YOUNG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>      Plaintiff,<br><br>  v.<br><br>GALE JOSEPH YOUNG<br><br>      Defendant. | No. CR08 0502 MMC<br><br>**DEFENDANT GALE JOSEPH YOUNG'S SENTENCING MEMORANDUM**<br><br>Date: January 18, 2012<br>Time: 2:15 p.m.<br>Crtrm: 7 (Hon. Maxine Chesney) |

**I.**

**INTRODUCTION**

  Thirty year old defendant Gale Joseph Young appears before this Court for sentencing following a jury verdict that he possessed crack cocaine with the intent to distribute. His guideline calculations recommend a sentencing range between 51-63 months and, with acknowledgment of the policy position of the United States Probation Office, the assigned probation officer has recommended a low end sentence of 51 months. The defendant concurs with that recommendation and submits that it is the fair and just sentence. The litigation in this case and the concession of the government that the Fair Sentencing Act is to be applied retroactively takes a mandatory minimum sentence out of the equation. Nonetheless, the government has outrageously

recommended a 10 year sentence for Mr. Young, essentially twice the high end of Mr. Young's guideline range. The Court should reject the government's preposterous suggestion.

The final Presentence Report (PSR) was prepared by United States Probation Officer Cheryl L. Simone. The defendant has only minor noted objections to the PSR, save for the objection to policy position of the national office as to the retroactivity of the Fair Sentencing Act, which is discussed below.

## II.

## FACTUAL BACKGROUND OF THE CASE

This Court presided over two trials for Mr. Young and is fully acquainted with the facts of this case. Mr. Young has been found guilty of possessing the baggie of crack cocaine found on the floor of the interview room of the Tenderloin police station on June 4, 2008 and he stands ready to be sentenced for that conviction.

This Court is also fully aware of the summer 2010 jury selection procedure which took place between the two trials, which resulted in the excusing of the jury panel and the introduction of us all to jailhouse informant James Jordan. The government now argues that the juror issue in this prior proceedings, and an alleged threat to James Jordan testified to in the second trial, partially justify their decade long sentencing recommendation. See Govt. Memo 2:16-4:3, 5:25-6:2, 8:23-28.[1] The background and testimony of James Jordan is discussed below, but defendant submits that the juror issue is not in any way a basis for departure from the guidelines.

The government has had since last summer to investigate any misconduct charges against Mr. Young for the issues surrounding the juror (Juror Tate). Mr. Jordan, of course, testified that Mr. Young told him that he had the juror "in the bag" ( See Govt. Memo 8:27), but the government has not been able to, and it is submitted that it can not, establish any actual personal connection between Mr. Young and the juror. Mr. Young has written a lengthy letter to the Court

---

[1] The government sets out a number of reasons for its weighty sentencing recommendation, including an anonymous, heavily redacted 2005 FBI 302 (Exhibit D to Govt. Sentencing Memo), and miscellaneous custodial printouts (Exhibit F to Govt. Sentencing Memo), both of which are discussed herein.

for his sentencing proceeding, which is attached hereto as Exhibit B. Among other things, he explains that he had never personally met juror Tate, but that he had reason to believe that juror Tate was a former girlfriend of one of his former cellmates when he was serving time in federal prison. He recognized her from her description of her children and pictures that had been posted on the prison wall by his former prison cellmate. Immaturely, he voiced this thought to an associate at the North County Jail, a statement which was apparently overheard by, or repeated to, the wily Mr. Jordan. Defendant Young denies ever claiming that he had any inside track on the juror or the juror panel, and the government's scripture like reliance on the words of James Jordan is absurd. Mr. Jordan was thoroughly exposed as a fabricating manipulator. The government has no proof of jury or juror misconduct by Mr. Young beyond the tales of Mr. Jordan, and the Jordan information on this issue can not fairly be used as an aggravating guideline variance factor for Mr. Young.

### III.

### PRESENTENCE REPORT AND SENTENCING RECOMMENDATION

Probation Officer Cheryl Simone has prepared a balanced and thoughtful report regarding Mr. Young. Her ultimate recommendation is that the defendant be sentenced to a low end guideline sentence of 51 months, with a home confinement/location monitoring commitment to satisfy the end of Mr. Young's sentence. Mr. Young's case presents a pretty unique situation. There is no denying Mr. Young's prior misdeeds, and he really has been in custody the vast majority of the time since his 14th birthday. He has been convicted of a drug possession charge. not a crime of violence, and he is going to get out of jail and be reunited with his family and given a chance to prove himself. Warehousing him for additional time is not going to serve any valid purpose and Mr. Young is truly fortunate to have a substantial support network that will help him make the transition to law abiding society. Modern techniques of monitoring, testing, counseling and supervision are there for him, and if he violates his conditions, severe consequences hang over his head. Mr. Young is truly lucky to have made it to his 30th birthday when 90% or more of his peers from the tougher streets of San Francisco have been killed or sentenced to decades in

prison. Ms. Simone has recognized some promise in Mr. Young as a survivor and someone who can make it off the "streets" and can prosper with the help of his family, and can potentially help a number of people along the way and be an example to a very challenged community.

As a practical matter, Mr. Young has been in actual federal custody on the present case for approximately 41 months. With statutory good time credits of 15% of his actual time, he has the rough equivalent of 45-46 months of custody credits. That leaves him about six months shy of satisfying a 51 month prison sentence. 51 months is a fair sentence under the circumstances of this case and the remainder of Mr. Young's sentence should be to assist him transition back in to society.

### IV.

### APPLICATION OF THE FAIR SENTENCING ACT

Contrary to the litigation in this case and the position of the government and the defendant, the *policy* of the United States Probation Office is that the Fair Sentencing Act (FSA) can not be retroactively applied until it is legally sanctioned by the legislature. The application of the FSA was briefed before the second trial of this matter and just prior to the hearing on the matter, the government conceded the issue of retroactivity and the application of the amended crack guidelines. Defendant submits that the retroactivity issue has been resolved and is essentially the law of this case. Should the Court have any reservations about this issue, defendant requests that the sentencing of Mr. Young be continued for a full briefing of the issue.

### V.

### CRIMINAL HISTORY FOR MR. YOUNG

Mr. Young's criminal history is set out in paragraphs 24 through 44 of the PSR. The present offense is Mr. Young's fourth felony conviction, with prior convictions for drug possession for sale, drunk driving with injury, and gun possession. He has been in and out of custody since age 14, and mostly in. As noted by the probation officer, Mr. Young's record is lengthy and serious. As noted by Mr. Young's mother, by Mr. Young himself, and also by the probation officer, in a perverse way Mr. Young's time in jail has saved him to this point and

allowed him to learn some profound lessons and mature. The defendant has earned his categorization as Criminal History Category V, and that is the way he should be viewed pursuant to the advisory guidelines.

### A. Gang Membership and Government Exhibit D.

The government focuses on Mr. Young's status as a Big Block gang member. The defendant does not deny that former status back in 2005 and before, but questions its current meaning. There is no current Big Block gang. Sadly, the Hunter's Point/Bayview neighborhood has disintegrated into a new set of gang sets and alliances and there is no longer any Big Block gang. The vast majority are dead, serving lengthy sentences, or hidden away in the witness protection program. Mr. Young no longer has a connection with that neighborhood or the forces within it. His family made it out of the neighborhood and now it is time for Mr. Young to move on as well. For years now Mr. Young has been in the prison and jail general population and has moved beyond the gang life and its consequences and dangers. The government's reliance on this part of Mr. Young's personal history as a current basis for additional enhanced punishment is unfounded.

The government has referenced Mr. Young's alleged sophisticated criminal conduct in relation to gang retaliation, an alleged orchestration of a rival gang member's release from custody so that the defendant could murder the rival gang member. See Govt. Memo 6:27-7:4. The support for this proposition is an anonymous heavily redacted FBI 302 from 2005 labeled as Exhibit D to the Government's Sentencing Memorandum. Defendant moves to strike Exhibit D. If it were not such a serious allegation, the attachment would almost be laughable. The 302 is at least six pages long (because text is excerpted from pages 5 and 6) with only a single paragraph being included, and has no identification as to who is making the statement or who supposedly received some incriminating, threatening letter. Counsel has never seen this 302 before its attachment to the Government's Sentencing Memorandum and has no way of adequately investigating or challenging this bold accusation now being used as support to double the

defendant's guideline sentence.[2] The Court should reject such flimsy evidence and recognize the gross overreaching by the government.

### B. Custodial Misconduct by Mr. Young and Exhibit F

The government suggests that a series of vague jail printouts manifest Mr. Young's disregard for the criminal justice system. Govt. Memo 9:1-6, Exhibit F. The computerized printouts from 2005 and 2011 provide no detail, and in response to the defendant's request, the government could provide no reports as the underlying conduct. Realistically, the printouts show that Mr. Young got in a mutual combat fight in the jail in 2005 and that he had an argument with a deputy in 2011 which resulted in a 30 day loss of privileges.[3]

## V.

## MR. YOUNG'S PERSONAL HISTORY

Mr. Young's personal history is adequately set out in the PSR and is further explained by the letters which have been forwarded to the Court. Letters from Mr. Young's mother and father were earlier submitted to Ms. Simone and are presumably attached to the Final PSR. Additional letters from family members and supporters are attached hereto as Exhibit A. Mr. Young was lost to the streets at an early age and ended up in jail for the vast majority of his adult life. His parents, siblings and other family members had their own personal issues and have quite admirably and fortunately come back around to welcome the defendant back in to their fold and stand firmly in support of his transition back to a lawful, productive life.

---

[2] Upon receipt of the Government Sentencing Memorandum and exhibits counsel asked for the identity of the person being interviewed and the full contents of the report. In response, counsel received from the government a heavily redacted full version of the report which did not identify the person who was apparently a cooperating witness in the 2005 federal Down Below Gang investigation. Culling information from the redacted report, the individual interviewed was apparently the driver who participated in a drive by shooting resulting in the death of an infant, who later set the vehicle on fire to destroy evidence, and who was proffering evidence to the government to negotiate some sort of deal. Mr. Young has no further information regarding this individual.

[3] According to Mr. Young, another inmate swore at a deputy and Mr. Young would not identify the speaker. The loss of privileges was later reduced to 15 days.

## VI.

## **INFORMATION REGARDING INFORMANT JAMES JORDAN**

The Court had the opportunity to meet and hear the testimony of jailhouse informant James Jordan.[4] In its sentencing memorandum the government preaches the words of Mr. Jordan as gospel. The jury verdict in this case was by no means a validation of Mr. Jordan's testimony and the defendant asks the Court to reject any support for an enhanced sentence for Mr. Young based on the testimony of Mr. Jordan.

Forty-two year old James Jordan has an extensive history of fraud, deceit, and manipulation. Defendant submits that Mr. Jordan's testimony in this case was not credible and thoroughly impeached at trial. Mr. Jordan's testimony was entirely consistent with the classic jailhouse informant artifice of creating information from tidbits of information gathered in a jail setting.

The government points specifically to an alleged threat by Mr. Young to Mr. Jordan testified about at trial for an obstruction of justice guideline enhancement of two levels and and an overall guideline sentence variance. See Govt. Memo 3:3-23, 5:25- 6:2. First of all, the government has now raised this issue for the first time in its sentencing memorandum, and said nothing to the probation officer as to an obstruction of justice enhancement in its letter to the probation officer regarding the draft PSR. More importantly, the Court heard the testimony of Mr. Jordan and Marshal Swanson regarding this supposed threat. Jordan testified to being told Mr. Young would see him "some day" and the Marshal heard Young say he would see him "Monday", the setting being a casual contact on a Friday with the trial beginning the following Monday. There is no basis for a formal obstruction of justice enhancement and the incredible and inconsistent testimony of Mr. Jordan should not be a basis to further punish Mr. Young.

---

[4] Mr. Jordan apparently got released from custody shortly after the verdict in this case, because counsel has seen him out of custody on two occasions. The docket for his case is full of sealed, inaccessible entries, but Mr. Jordan has clearly succeeded in his goal of bargaining his testimony for his temporary freedom.

# VII.

## THE PERSONAL BACKGROUND OF MR. YOUNG AND ANALYSIS PURSUANT TO 18 U.S.C. § 3553(a)

The primary directive in § 3553(a) is that the court must impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. *See*, 18 U.S.C. § 3553(a) Those purposes include the need: (1) to provide just punishment; (2) to create adequate deterrence; (3) to protect the public; and (4) to provide the defendant necessary treatment and training. 18 U.S.C. § 3553(a)(2). For all the reasons set out above, a 51 month sentence for Mr. Young is a fair, just and adequate sentence. The government couches its Draconian sentence recommendation as based on §3553 factors, but provides no foundation for such a sentence beyond what is already calculated by the guidelines. The government's weak, unsubstantiated arguments for guideline variance fall apart on analysis and/or the Court is in a position to evaluate the overreaching factual assertions.

## **CONCLUSION**

For the foregoing reasons, Defendant requests this Court to impose the sentence suggested in the Presentence Report consistent with the application of the Fair Sentencing Act.

Dated: January 17, 2012					Respectfully submitted,


									_____/s/_____
									ROBERT WAGGENER
									Attorney for Defendant
									GALE JOSEPH YOUNG